**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

BRUCE WILSON and EMINENT ENERGY PROMOTIONS,

Plaintiffs,

v.

BARBARA BARRA, PAUL O'DONNELL, and LEE HECHT HARRISON,

Defendants.

C.A. No. 05-30067-MAP

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)**

Defendants, Barbara Barra, Paul O'Donnell, and Lee Hecht Harrison LLC ("LHH") (collectively referred to as "Defendants"), submit this memorandum of law in support of their motion to dismiss Plaintiffs' claims in their entirety.

**INTRODUCTION**

Plaintiffs Bruce Wilson and Eminent Energy Promotions ("Plaintiffs") bring a Complaint against Defendants[1], notwithstanding the fact that Mr. Wilson executed a general release of any and all claims, known and unknown, against Defendants in exchange for valuable consideration. Plaintiffs' attempt to repudiate the release agreement with Defendants cannot be countenanced. Moreover, Plaintiff Eminent Energy Promotions's claim should be dismissed because it lacks standing to bring suit against the Defendants.

[1] It is unclear from the face of Plaintiffs' Complaint what causes of action they are asserting against the Defendants.

**STATEMENT OF FACTS**[2]

1. Defendant Barbara Barra is an Executive Vice President and Officer of LHH. (See Complaint, caption).[3]

2. Defendant Paul O'Donnell is an Officer and Director of LHH. (See Compl., caption).

3. Mr. Wilson was formerly employed by General Reinsurance Corporation ("GenRe"). (Compl., ¶ 7).

4. Mr. Wilson's last day of active employment with GenRe was September 8, 2004. (Ex. 1 to Compl., ¶ 2(a)). Mr. Wilson was placed on inactive status beginning on September 9, 2004 until his official termination date of October 31, 2004. (Id.). During this period of inactive status, Mr. Wilson continued on payroll for salary and benefit purposes. (Id.).

5. On or about September 10, 2004, GenRe and Mr. Wilson executed an Agreement and General Release (the "Original Agreement"). (See Compl., ¶ 7; Ex. 1 to Compl.).

6. The Original Agreement provides that GenRe agreed to pay Bruce L. Wilson compensation in exchange for Mr. Wilson knowingly and voluntarily releasing and forever discharging GenRe of and from any and all claims, known and unknown, against GenRe. (Ex. 1 to Compl., ¶¶ 2(b), 9). The Original Agreement also provides that GenRe engaged the services of LHH to provide Mr. Wilson professional outplacement counseling. (Compl., ¶ 9; Ex. 1 to Compl., ¶ 2(e)).

7. On November 17, 2004, GenRe invoiced LHH $12,500.00 for the cost of Mr. Wilson's participation in LHH's Executive Service program. (Ex. 2 to Compl.).

---

[2] For purposes of this motion only, Defendants accept as true the allegations contained in Plaintiffs' Complaint.

[3] Plaintiffs' Complaint is attached hereto as Exhibit A. Hereinafter, Plaintiffs' Complaint will be cited as (Compl., ¶__).

8.    On January 28, 2005, Barbara Barra ("Barra"), Executive Vice President, Northeast Region, advised Mr. Wilson that LHH had discontinued its services with Mr. Wilson and that the unused portion of the fee for the cost of Mr. Wilson's participation in LHH's Executive Service program would be credited to Mr. Wilson's former employer, GenRe. (Compl., ¶ 23; Ex. 5 to Compl.).   LHH agreed to pay GenRe the unused portion of the $12,500.00. (Compl., ¶¶ 25, 33).

9.    Plaintiff does not have standing to contest Defendants' right to terminate the professional services contract with Plaintiff.  (Compl., ¶ 24).

10.    On February 24, 2005, Zoe Hopkins, Senior Vice President and Assistant General Counsel of GenRe, notified Mr. Wilson that GenRe offered to pay Mr. Wilson a lump sum payment of $12,500.00, less taxes and deductions, "in return for a release of all claims relating to outplacement services" offered to him by LHH.   (Exhibit 3 to Compl.).   The $12,500.00 represented the value of LHH's services, as confirmed by their invoice dated November 17, 2004. (Id.).

11.    On February 24, 2005, GenRe executed the Amendment to Agreement and General Release (the "General Release").  (Ex. 9 to Compl.).  Ms. Hopkins provided Mr. Wilson duplicate originals of the General Release for his signature.  (Ex. 3 to Compl.).

12.    The General Release provides that in consideration for signing the General Release and in lieu of the outplacement assistance provided to Mr. Wilson, GenRe agreed to pay Mr. Wilson a total of $12,500.00, less appropriate taxes and deductions, which represents the full value of the outplacement assistance to Mr. Wilson if the program had been completed.  (Ex. 3, 9 to Compl.).  GenRe would compensate Mr. Wilson in exchange for Mr. Wilson signing a full

release of any and all claims known and unknown against Gen Re, LHH, and, in part, LHH's

current employees, officers, and directors:

> General Release of Claim. Employee knowingly and voluntarily **releases and forever discharges the Company and Lee Hecht Harrison ("Lee Hecht"), their parent corporations, affiliates, subsidiaries, divisions, predecessor organization, successors and assigns, and their current and former employees, officers, directors, attorneys and agents thereof (referred to collectively throughout this Amendment as the "Released Entities"), in their official and individual capacities of and from any and all claims, known and unknown,** against the Company and Lee Hecht, which Employee, his heirs, executors, administrators, successors, and assigns (referred to collectively throughout this Amendment as "Employee") have or may have **as of the date of execution of this Amendment**, including but not limited to any and all claims relating to Outplacement Assistance provided to Employee from September 9, 2004 up to the date of execution of this Amendment, any public policy, contract (express, written or implied), tort or common law, any allegation for costs, fees, or other expenses including attorneys' fees incurred in these matters.

(Ex. 3, 9 to Compl.) (emphasis in original).

       13.    The General Release provides that:

> Except as provided in this Amendment, the [Original Agreement] sets forth the entire agreement between the Employee and the Released Entities hereto, and fully supersedes any prior agreements or understandings between the parties. Employee acknowledges that he has not relied upon any representations, promises, or agreements of any kind made to him in connection with his decision to accept this Amendment, except as those set forth in this Amendment. **EMPLOYEE UNDERSTANDS AND AGREES THAT ANY MODIFICATIONS, MATERIAL OR OTHERWISE MADE TO THE AGREEMENT AND GENERAL RELEASE DO NOT AFFECT IN ANY MANNER THE PARTIES OBLIGATIONS UNDER ORIGINAL AGREEMENT AND GENERAL RELEASE, EXCEPT AS EXPRESSLY PROVIDED INTHIS [sic] AMENDMENT.**

(Ex. 3, 9 to Compl, ¶ 4) (emphasis in original).

14. On February 28, 2005, Mr. Wilson executed the General Release and provided Ms. Hopkins the fully-executed General Release. (Ex. 3 to Compl.). Mr. Wilson handwrote on the General Release, "pls [sic] leave me as much discretion as legally possible to manage my taxes, i.e. pls [sic] withhold as low a % as possible for the fewest # of agencies as possible. The value of the outplacement contract was not subject to any court orders applying to, or involving, genre at its inception, or at any time thereafter, and should not, therefore, be subject to any such orders now." (Compl., ¶ 34; Ex. 3 to Compl.).

15. The settlement amount was subject to an existing court garnishment order. (Compl., ¶ 35).

16. On or about March 2, 2005, GenRe issued Mr. Wilson a check for $6,302.42. (Ex. 7 to Compl.). This check represented the gross amount of $12,500.00, minus federal withholdings ($700.00), Social Security ($775.00), Medicare ($181.25), State taxes ($958.33), and a court-imposed garnishment ($3,583.00), for a net amount of $6,302.42. (Ex. 6, 8 to Compl.). GenRe deducted the sum of $3,583.00 from the $12,500.00 settlement pursuant to a Court order. (Compl., ¶¶ 35-36).

17. Mr. Wilson created Eminent Energy Promotions ("EEP") to provide income to support Mr. Wilson and his children and to accumulate long-term wealth for Mr. Wilson's children, as of October 31, 2005. (Compl., ¶¶ 29, 30).

## ARGUMENT

### I. STANDARD FOR RULE 12(b)(6) MOTION

A Rule 12(b)(6) motion to dismiss should be allowed if it appears that the nonmoving party can prove no set of facts in support of its claim which would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). In deciding a motion to dismiss under Rule 12(b)(6), the court assumes the truth of all well-pleaded facts and indulges all reasonable inferences therefore

that fit the plaintiff's stated theory of liability. Arruda v. Sears, 310 F.3d 13, 18 (1st Cir. 2002). Although a court must take all well-pleaded facts as true, it need not credit a complaint's "bald assertions" or legal conclusions. Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1216 (1st Cir. 1996); see also Arruda, 310 F.3d at 18 (noting that the court gives no weight to "bald assertions, unsupportable conclusions and opprobrious epithets") (quoting Chrongris v. Bd. of Appeals, 811 F.2d 36, 37 (1st Cir. 1987)). In this case, viewing Plaintiffs' Complaint in the light most favorable to Plaintiffs, there is no entitlement to relief.

## II. THE CLAIMS ASSERTED BY PLAINTIFFS IN THEIR COMPLAINT ARE BARRED BY THE RELEASE OF CLAIMS MR. WILSON EXECUTED

Plaintiffs' Complaint must be dismissed in its entirety because Mr. Wilson executed a valid general release of all claims against the Defendants on February 28, 2005, in exchange for valuable consideration. Specifically, in consideration for Mr. Wilson's receipt of a lump sum payment of $12,500.00, less taxes and deductions, from GenRe, Mr. Wilson released and discharged Defendants LHH, Barbara Barra and Paul O'Donnell of any and all claims, known and unknown:

> General Release of Claim. Employee knowingly and voluntarily **releases and forever discharges the Company and Lee Hecht Harrison ("Lee Hecht"), their parent** corporations**, affiliates, subsidiaries, divisions, predecessor organization, successors and assigns, and their current and former employees, officers, directors, attorneys and agents thereof (referred to collectively throughout this Amendment as the "Released Entities"), in their official and individual capacities of and from any and all claims, known and unknown,** against the Company and Lee Hecht, which Employee, his heirs, executors, administrators, successors, and assigns (referred to collectively throughout this Amendment as "Employee") have or may have **as of the date of execution of this Amendment**, including but not limited to any and all claims relating to Outplacement Assistance provided to Employee from September 9, 2004 up to the date of execution of this Amendment, any public policy, contract

> (express, written or implied), tort or common law, any allegation for costs, fees, or other expenses including attorneys' fees incurred in these matters.

(Ex. 3 to Compl.) (emphasis in original).

**A. Mr. Wilson's Release Of Claims Is Valid And Enforceable**

Plaintiffs have not identified any basis for challenging the validity of the General Release. On March 2, 2005, GenRe plainly satisfied the terms of the General Release when it provided Mr. Wilson a check for $6,302.42, which represented the agreed upon amount of $12,500.00 minus applicable taxes and deductions. (Ex. 3, 7 to Compl.). Mr. Wilson accepted this check. (Ex. 7 to Compl.). Because GenRe complied with its side of the bargain, Mr. Wilson was contractually bound to release all claims, known and unknown, against LHH, Barbara Barra, and Paul O'Donnell. (Ex. 3 to Compl.).

Because it is a valid contract, the language of the General Release is enforceable and forbids Mr. Wilson from bringing his present claims against LHH, Ms. Barra[4], and Mr. O'Donnell[5]. The General Release was written in a manner to be understood, the General Release did not purport to waive claims arising after the date of execution, and the General Release was supported by valuable consideration. (Ex. 3 to Compl.). Mr. Wilson was given substantial and pertinent information to enable him to assess what he was giving up by signing the General Release, and no claims have been alleged since the date of the contract's execution. Accordingly, Plaintiffs' claims are barred by the release of claims Mr. Wilson executed.

Courts routinely uphold releases executed by employees in the employment law context. See Rivera-Flores v. Bristol-Myers Squibb Caribbean, 112 F.3d 9, 11-12 (1st Cir. 1997)

---

[4] Plaintiffs aver that Ms. Barra is an Officer of LHH; accordingly, she is encompassed by the General Release. (Compl., caption).

[5] Plaintiffs aver that Mr. O'Donnell is an Officer and Director of LHH. (Compl., caption). Accordingly, he too is encompassed by the General Release.

(upholding waiver of claim under Americans with Disabilities Act); Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 181-182 (1st Cir. 1995) (recognizing validity of release of claims under the Employee Retirement Income Security Act of 1974). Plaintiffs have not articulated any basis for invalidating the release as to their claims. Accordingly, Defendants are entitled to dismissal of Plaintiffs' claims for this reason alone.

**B. Mr. Wilson's Additional Handwritten Terms Were Not Incorporated Into The General Release**

Plaintiffs apparently seek to invalidate the release of Mr. Wilson's claims against LHH, Ms. Barra and Mr. O'Donnell by contending that GenRe did not comply with the terms of the General Release. Plaintiffs appear to aver that Mr. Wilson's additional, handwritten terms[6] to the General Release were incorporated into the contract, and that GenRe violated these terms when it deducted from the $12,500.00 settlement amount pursuant to a court garnishment order. Plaintiffs' argument has no merit, however, as these additional handwritten terms were neither incorporated into the General Release nor were they legally enforceable.

Notwithstanding the fact that Plaintiffs' alleged harm was caused by persons or entities other than the Defendants, Mr. Wilson's proposed additional terms are merely proposals to the General Release and were not incorporated into the contract. Connecticut[7] maintains the "well-established rule of construction" that, when interpreting a contract, the court, "must look at the

---

[6] When Mr. Wilson executed the General Release on February 28, 2005, he handwrote on the contract's second page, "pls [sic] leave me as much discretion as legally possible to manage my taxes, i.e. pls [sic] withhold as low a % as possible for the fewest # of agencies as possible. The value of the outplacement contract was not subject to any court orders applying to, or involving, genre at its inception, or at any time thereafter, and should not, therefore, be subject to any such orders now." (Compl., ¶ 34; Ex. 3 to Compl.).

[7] The parties contractually agreed that the Original Agreement and General Release are governed by Connecticut law. (Ex. 1 to Compl., ¶ 17). The General Release incorporates this provision. (See Ex. 3 to Compl., ¶ 4). If two contracting parties express a specific intent as to the governing law, Massachusetts courts will uphold the parties' choice as long as the result is not contrary to public policy and as long as the designated state has some substantial relation to the contract. Dykes v. Depuy, Inc., 140 F.3d 31, 39 (1st Cir. 1998). In this instance, both criteria are met. Mr. Wilson's former employer, GenRe, is located in Stamford, Connecticut. (Compl., ¶ 7).

contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result." Lux v. Envtl. Warranty, Inc., 755 A.2d 936, 941 (Conn. App. Ct. 2000) (quoting O'Brien v. U.S. Fid. & Guar. Co., 669 A.2d 1221, 1224 (Conn. 1996)); Duse v. Internat'l Bus. Machs. Corp., 252 F.3d 151, 158 (2nd Cir. 2001) (positing that under Connecticut law, where a contract's language is clear and unambiguous, the contract should be given effect according to its terms); see also Bradley Auto Wash Sales, Inc. v. BP Oil, Inc., 1981 U.S. Dist. LEXIS 10018, *10 (D. Mass. Dec. 29, 1981) (noting that in Massachusetts, a contract should be construed with reference to the situation of the parties when they made it and the objects sought to be accomplished). When analyzing a settlement agreement, the court will ascertain the parties' intent by a fair and reasonable construction of the written words and will not "torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." See Pesino v. Atlantic Bank of N.Y., 709 A.2d 540, 545 (Conn. 1998) (court enforced settlement agreement according to its plain language and consistent with the agreement's purpose) (quoting Lawson v. Whitey's Frame Shop, 697 A.2d 1137, 1141 (Conn. 1997)).

According to Connecticut rules of contract construction, the General Release must be interpreted as a whole and the contract given effect according to its terms. See Duse, 252 F.3d at 158; Lux, 755 A.2d at 941. A fair and reasonable construction of the General Release provides that GenRe agreed to provide Mr. Wilson $12,500.00, less appropriate taxes and deductions, in exchange for Mr. Wilson discharging LHH, Ms. Barra, and Mr. O'Donnell from any and all claims, known and unknown. See Ex. 3 to Compl. A settlement agreement, voluntarily entered into, is legally enforceable and binding upon the parties and, once entered into, cannot be repudiated by either party, even if one party to the agreement subsequently changes her mind and

seeks to rescind or repudiate the agreement. Zauner v. Brewer, No. 049135, 1992 WL 205179, at *2 (Conn. Super. Ct. Aug. 11, 1992) (unpublished opinion); see also Behling v. Bennett, No. CV980089600S, 2002 Conn. Super. LEXIS 1389 at *11 (Conn. Super. Ct. Apr. 24, 2002) (unpublished opinion) (noting that, once reached, a settlement agreement cannot be repudiated by either party). GenRe abided by its promise to pay Mr. Wilson a total of $12,500.00, less appropriate taxes and deductions. Accordingly, Mr. Wilson is required to comply with his obligations pursuant to the contract and discharge the Defendants from any and all claims, known and unknown. See id. There is no reason in this instance to "torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." See Pesino, 709 A.2d at 545.

### C. Mr. Wilson's Additional Handwritten Terms Are Not Legally Enforceable

Moreover, Mr. Wilson's handwritten additions to the General Release are not enforceable because these terms are, at best, contrary to public policy and of questionable legality. See Compl., ¶ 34; Ex. 3 to Compl.). The so-called "condition" that the value of the outplacement contract not be subject to any court order cannot be enforced by the Court because this provision requires the obstruction of the administration of justice. GenRe was obligated by law to comply with the Court-ordered garnishment, and consequently was legally required to make deductions from the settlement amount. See Ex. 6 to Compl. Indeed, Plaintiffs admit in the Complaint that the settlement amount was subject to an existing court garnishment order. (Compl., ¶ 35).

Under both Connecticut and Massachusetts law, courts will not enforce a provision in a contract which is subversive of an established public policy or violative of the law. See, e.g., Chicago & Alton R.R. Co. v. Kirby, 225 U.S. 155 (1912) (holding that a plaintiff may not maintain an action in which he must, to make out his case, invoke aid from an illegal demand or

contract); Malden Mills Indus., Inc. v. Ilgwu Nat'l Ret. Fund, 766 F. Supp. 1202, 1209 n.11 (D.

Mass. 1991) ("When the term of a contract,…is contrary to or violates an explicit public policy

which is 'well defined and dominant,' however, the term is unenforceable") (internal quotation

omitted); New Fairfield Bd. of Educ. v. Cortese, No. CV030349701S, 2005 Conn. Super. LEXIS

399 at *20 (Conn. Super. Ct. Jan. 24, 2005) (unpublished opinion) (deeming unenforceable a

provision of settlement agreement prohibiting parents from due process hearing to challenge

their child's school placement and enforcing remainder of agreement).

      An otherwise legal agreement will not be rendered unenforceable merely because one

provision in the agreement is deemed illegal. Indeed, the Court has the authority to ignore

unreasonable provisions of a contract and enforce the remaining provisions of the contract. See

Cortese, 2005 Conn. Super. LEXIS 399, at *21-22 ("Although one part of [a] settlement

agreement may be declared unenforceable as against public policy, the remainder of the

agreement may be severed from the whole and still be enforced"); see also Venture Partners, Ltd.

v. Synapse Techs., Inc., 679 A.2d 372, 377 (Conn. App. Ct. 1996). A severable contract is one

in its nature and purpose susceptible of division and apportionment. Venture Partners, Ltd., 679

A.2d at 377. In determining the severability of a contract, the court looks to whether the

contract's parts and its consideration are common to or independent of each other. Id. If

Massachusetts law were to apply, the Court would maintain the ability to ignore Mr. Wilson's

unenforceable, added provision. See, e.g., In re. 604 Columbus Ave. Realty Trust v. Capital

Bank & Trust Co., 119 B.R. 350, 372 (D. Mass. 1990) ("In Massachusetts, the illegality of one

portion of an otherwise legal agreement does not necessarily render the entire agreement

unenforceable.").

Mr. Wilson's handwritten terms requiring GenRe to defy any court-ordered garnishments are both against public policy and likely illegal. See Cortese, 2005 Conn. Super. LEXIS 399, at *21-22. Indeed, Mr. Wilson himself appears to recognize the legal impossibility of his suggested conditions, asking GenRe to "pls [sic] leave me *as much discretion as legally possible* to manage my taxes…(Compl., ¶ 34; Ex. 3 to Compl.) (emphasis added). Accordingly, this Court should ignore Mr. Wilson's handwritten, illegal provisions and enforce the remaining portions of the General Release. See Cortese, 2005 Conn. Super. LEXIS 399, at *21-22. By disregarding these additional provisions, the contract may be given effect according to its terms and pursuant to the parties' understanding. See Duse, 252 F.3d at 158; Venture Partners, Ltd., 679 A.2d at 377. GenRe has fully complied with the remaining provisions of the General Release by providing Mr. Wilson a check for $6,302.42, representing the agreed upon amount of $12,500.00 minus applicable taxes and deductions. (Ex. 3, 7 to Compl.). The General Release is a valid contract and consequently Mr. Wilson is bound to comply with his obligation to release and forever discharge the Defendants of and from any and all claims, known and unknown, against LHH, Barbara Barra, and Paul O'Donnell.

## III. EMINENT ENERGY PROMOTIONS LACKS STANDING TO BRING A SUIT AND THUS ITS CLAIM SHOULD BE DISMISSED

Plaintiff Eminent Energy Promotions' ("EEP") claim should be dismissed because it lacks standing to bring suit against the Defendants. This undefined entity cannot state a cause of action against Defendants because it has not suffered an injury-in-fact and it is not a third-party beneficiary to the General Release. Based on any and all of these grounds, EEP's claim must be dismissed.

**A. EEP Has Not Suffered An Injury-In-Fact Sufficient To Establish Standing**

To establish standing, a plaintiff must satisfy three fundamental constitutional requisites: (1) an injury-in-fact; (2) causation; and (3) redress ability. Benjamin v. Aroostook Med. Ctr., Inc., 57 F.3d 101, 104 (1st Cir. 1995); McInnis-Misenor v. Me. Med. Ctr., 319 F.3d 63, 67 (1st Cir. 2003) (A litigant must prove "that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury can be fairly traced to the challenged action and is likely to be redressed by a favorable decision") (internal quotations omitted). To satisfy the first element, injury-in-fact, a plaintiff must demonstrate that he has sustained or is immediately in danger of sustaining some direct injury that is both real and immediate, and not conjectural or hypothetical. Steir v. Girl Scouts of the USA, 383 F.3d 7, 15 (1st Cir. 2004). EEP bears the burden of establishing that standing exists. Id.; Benjamin, 57 F.3d at 104 ("The burden of alleging facts necessary to establish standing falls upon the party seeking to invoke the jurisdiction of the federal court.").

EEP lacks standing in part because it cannot prove that it has suffered an injury-in-fact as a result of the Defendants' allegedly illegal conduct. See Benjamin, 57 F.3d at 104; see also McInnis-Misenor, 319 F.3d at 67 (Noting that Rule 12(b)(6) does not require the court to make inferences necessary to establish there is federal jurisdiction). The Plaintiffs fail to aver that EEP has sustained, or is immediately in danger of sustaining, a direct injury that is real and immediate and not conjectural or hypothetical. See Steir, 383 F.3d at 15. Indeed, *no where* in the Complaint do the Plaintiffs particularize EEP's alleged injury. Accordingly, EEP cannot meet its burden to establish standing. See id.

**B. EEP Lacks Standing As It Is Not A Third-Party Beneficiary To The General Release**

EEP additionally lacks standing to bring a claim against Defendants because it is not a third-party beneficiary to the General Release. Prudential limitations are placed on the exercise of federal court jurisdiction: a plaintiff must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties. McInnis-Misenor, 319 F.3d at 68; see also Benjamin, 57 F.3d at 105 (positing that "the prudential rule against third-party standing" provides that standing does not lie where the plaintiff asserts the rights and interests of a third party and not his own). In order to recover as a third-party beneficiary to a contract under Massachusetts law, a plaintiff must show that it was an intended beneficiary of a contract between the promisor and the promisee. See Spinner v. Nutt, 417 Mass. 549, 555 (1994). A party is an intended beneficiary where the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. Id. The fact that a third party is incidentally benefited is not sufficient to qualify that third party as a third-party beneficiary to the contract. See id. at 556; see also In re. Pharm. Indus. Average Wholesale Price Litig., 339 F. Supp. 2d 165, 176 (D. Mass. 2004) (noting that indirect standing is disfavored by the courts because it lead to double recovery and because the necessary causal link between the actions of the primary violator and the party claiming injury is too remote).

EEP plainly was not a third-party beneficiary to the General Release and thus lacks standing to sue. See McInnis-Misenor, 319 F.3d at 68. There is no evidence, in either the General Release or in the Complaint, tending to show that GenRe and Mr. Wilson entered into the General Release with the intent to benefit the third party, EEP. See Spinner, 417 Mass. at 549. The General Release does not include any language creating an obligation running to EEP, or indicating any knowledge of EEP's existence. See id. The fact that EEP *may have gained* an

incidental benefit from execution of the General Release is not enough to support third-party beneficiary status.  See Spinner, 417 Mass. at 556.  Because EEP lacks standing, the Court is without subject matter jurisdiction to determine the party's alleged claims.

## IV.    EEP, AN UNINCORPORATED ASSOCIATION OR UNINCORPORATED SOLE PROPRIETORSHIP, CANNOT BE A PARTY TO LITIGATION

Even if EEP alleged a concrete injury in the Complaint, EEP cannot be party to the present litigation because it is, at most, an unincorporated association or unincorporated sole proprietorship.[8]  In Massachusetts, an unincorporated association cannot be a party to litigation. See, e.g., Save the Bay, Inc. v. Dep't of Pub. Utils., 366 Mass. 667, 675 (1975); Maria Konopnicka Soc'y of the Holy Trinity Polish Roman Catholic Church v. Maria Konopnicka Soc'y, 331 Mass. 565, 568 (1954) ("it is settled law that [an unincorporated association] is not a separate entity and cannot be a party to litigation.") (suit against unincorporated association dismissed because it was not a legal entity); Tyler v. Boot & Shoe Workers' Union, 285 Mass. 54, 55 (1933) (holding that a voluntary unincorporated association cannot be a party to litigation and has no capacity to sue or to be sued in its own name); Cheever v. Graves, 32 Mass. App. Ct. 601, 604-05 (1992) (noting that an unincorporated association may not be a party to litigation); Harvard Square Def. Fund, Inc. v. Planning Bd. of Cambridge, 27 Mass. App. Ct. 491, 496 n.9 (1989).  The First Circuit Court of Appeals has applied this doctrine to unincorporated sole proprietorships as well.  Murphy v. Erwin-Wasey, 460 F.2d 661, 666 (1st Cir. 1972) (applying to an unincorporated sole proprietorship the Massachusetts requirement that an unincorporated association sue only in the name of its owners and not in its own name).  In doing so the court referred to the defendant's unincorporated sole proprietorship as "nothing more than a name by which the proprietor does business."  Id.

---

[8] EEP is not registered with the Massachusetts Secretary of State as a corporation, limited liability company or partnership, or voluntary association.

EEP likewise is nothing more than a name by which Mr. Wilson does business and thus cannot be a party to the present litigation. EEP is the "vehicle by which plaintiff accumulates long-term wealth for plaintiff's children, thereby promoting their financial security and welfare." (Compl., ¶¶ 29, 30). Mr. Wilson has already brought suit under his own name to vindicate his perceived injuries. EEP, Mr. Wilson's unincorporated association or sole proprietorship, is not a separate legal entity and therefore cannot independently bring a cause of action against the defendants. See Murphy, 460 F.2d at 666.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss Plaintiffs' Complaint and enter judgment for Defendants on the Complaint in its entirety.

Respectfully submitted,

Barbara Barra, Paul O'Donnell, and
Lee Hecht Harrison LLC,

By their attorneys,

/s/ Thomas Royall Smith
Thomas Royall Smith (BBO # 470300)
Amanda S. Rosenfeld (BBO # 654101)
Jackson Lewis LLP
75 Park Plaza
Boston, MA 02116
(617) 367-0025

Dated: May 13, 2005

CA 05 30067 MAP

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---X

Bruce Wilson, Individually & for the interests & welfare of Plaintiff's Children
351 Pleasant Street
Suite B . PMB 352
Hampshire County
Northampton, MA 01060,

PLAINTIFF #1

eminent energy promotions
bruce wilson, president
351 pleasant street
suite b . pmb 352
hampshire county
northampton . ma . 01060

PLAINTIFF #2

FILED
IN CLERK'S OFFICE
2005 MAR 14 P 2:43
U.S. DISTRICT COURT
DISTRICT OF MASS.

versus

DOCKETED

**COMPLAINT**

Barbara Barra, Individually as Officer
Executive Vice President
Lee Hecht Harrison
50 Tice Boulevard
Bergen County
Woodcliff Lake, NJ 07677

DEFENDANT #1

Paul O'Donnell, Individually as Officer & Director
Chief Executive Officer
Lee Hecht Harrison
50 Tice Boulevard
Bergen County
Woodcliff Lake, NJ 07677

DEFENDANT #2

Lee Hecht Harrison, Corporately
50 Tice Boulevard
Bergen County
Woodcliff Lake, NJ 07677

DEFENDANT #3

---X

## PARTIES

1. Plaintiff #1 is a resident of Hampshire County, Massachusetts and a citizen of the United States

2. Plaintiff #2 is a resident of Hampshire County, Massachusetts and a citizen of the United States

3. Defendant #1 is a resident of Bergen County, New Jersey and citizen of the United States

4. Defendant #2 is a resident of Bergen County, New Jersey and citizen of the United States

5. Defendant #3 is a resident of Bergen County, New Jersey and citizen of the United States

## JURISDICTION

6. This court has jurisdiction over this matter, including but not limited to:

    a. Title 42 . Chapter 21 . U.S.C. $ 1983

    b. diversity of residences; different states [Massachusetts, New Jersey, Connecticut & Delaware]

    c. damage to plaintiff's interests, along with amounts in contention, exceed $75,000 threshold

## FACTS

7. plaintiff and General Reinsurance Corporation, 695 East Main Street, Stamford, CT 06901 ["gen re"], plaintiff's former employer, are two of two signatories to an Agreement and General Release [the "agreement"] dated September 8, 2004 [Exhibit #1]

8. defendants are not signatories to the agreement

9. defendants agreed to provide plaintiff outplacement assistance services by way of a Professional Services Contract [the "contract"] embedded in the agreement as paragraph (2e)

10. defendants agreed to provide professional services to plaintiff independently, and apart from, other services and consideration provided to plaintiff by gen re, under the agreement [i.e. delivery of medical insurance benefits or life insurance services]

11. defendants are experienced, senior executives in the provision of professional outplacement and career services [Exhibit #4]

12. defendants and gen re are two of two signatories to the contract

13. plaintiff is not a signatory to the contract

14. the professional services contract, is an asset owned 100% by the plaintiff, along with ownership interests in other benefits, rights and assets in the agreement as a signatory to the agreement

15. plaintiff's ownership interests in the various assets provided by the agreement, each in their respective "stores of value", including the contract, are 100%, unencumbered, pledged or otherwise not garnished or limited in use or disposition

16. the term of the agreement is twelve months, from November 1, 2004 to October 31, 2005

17. the term of the contract is twelve months, from November 15, 2004 to November 15, 2005 [Exhibit #2]

18. the unused portion of the financial value of the professional services contract is represented by defendants to be $12,500 [Exhibit #3]

19. plaintiff submitted three requests to defendants, during the time period from November 15, 2004 to January 28, 2005, for a copy of the professional services contract

20. defendants have denied & refused all three plaintiff requests, all without explanation; therefore plaintiff has no evidence to validate the credibility of the contract's value [similar contracts are reported to have value many times what has been represented by defendants, often billing as much as $5,000 to $10,000 per month]

21. the agreement with gen re requires plaintiff grant a general release to General Reinsurance Corporation and its agents, from any and all claims, known and unknown, "as of the date of execution of the agreement and general release"

22. the referenced civil action arises from a claim occurring after the date of execution of the agreement, by an agent of General Reinsurance Corporation; therefore, the terms of the general release in the agreement do not apply to the current civil action, and plaintiff is not obligated to abide by those terms in this current action

23. defendants arbitrarily, unilaterally, without credible bases, and without consent of plaintiff, terminated their professional services contract on January 28, 005, representing approximately 20% of the time & value used under the contract, leaving 80% as the unused portion of the value of the contract [Exhibit #5]

24. plaintiff does not have standing to contest defendants' right to terminate the contract; plaintiff has no contract document evidencing the contract that might provide standing to do so

25. defendants arbitrarily, unilaterally without credible bases, and without consent of plaintiff, credited the unused portion of the professional services contract, plaintiff's asset, to plaintiff's former employer, General Reinsurance Corporation, rather than directly to plaintiff, as suggested and later requested

26. plaintiff disputes the *manner and method of the implementation* of defendant's termination decision, specifically, the unilateral assertion of ownership rights over plaintiff's asset (the unused portion of the professional services contract) exercised through the put back to gen re of the financial value of the asset, rather than direct delivery to plaintiff

27. this asset is owned by plaintiff, over which defendants invaded and trampled plaintiff's contractual property ownership right to the use of the asset, or any other action plaintiff deems necessary and appropriate

28. plaintiff relied on, and was becoming increasingly reliant on, during the time from contract inception, November 15, 2004 to date of termination, January 28, 2005 (the 20% expired), the value of the defendant's professional services, provided to plaintiff and plaintiff's business, by a three-person team, for the initiation, design, development and launch of a new, entrepreneurial program and for-profit business serving teens under a suicide prevention effort

29. plaintiff created the new business to provide income to support plaintiff, and to support plaintiff's children, upon termination of the agreement on October 31, 2005

30. plaintiff created the new business to be the vehicle by which plaintiff accumulates long-term wealth for plaintiff's children, thereby promoting their financial security and welfare

31. defendants actions compromised plaintiff's contractual property right to the professional services asset by falsely asserting unilateral ownership rights over its use, and put at risk the value of the asset by sending it back to gen re as a credit where it was previously known various orders had a high probability of compromising the value to plaintiff, damaging plaintiff's interests, and introducing a divergence in interests with gen re

32. loss of the asset, and loss of use of the asset, caused plaintiff to cease new program and business activities, suffering financial and economic losses due to lost business opportunities

33. defendants induced gen re, or gen re volunteered, to negotiate settlement of defendant's damages by cash compensation in the amount of $12,500 [Exhibit #3]

34. plaintiff agreed to enter the settlement agreement on conditions, one of which was that the value of the contract asset not be subjected to any garnishments, court orders or other levies excluding tax withholding [Exhibit #3, page 3 & Exhibit #9]

> "the value of the outplacement contract was not subject to any court orders applying to, or involving, gen re at its inception, or at any time thereafter, and should not, therefore, be subject to any such orders now"

35. in the settlement & internal payment administrative process, general reinsurance corporation implemented an erroneous deduction in the amount of a $3,583 garnishment by arbitrarily and unilaterally, reclassifying the asset from its store of value as a contract asset, to a store of value as cash compensation, thereby wrongly subjecting the asset to existing court orders [Exhibit #6]

36. the professional decisions of the defendants wrongly stripped plaintiff of plaintiff's use, and ownership, of the contract asset for a five week period of time, from date of termination, January 28, 2005, to date of settlement March 3, 2005, representing approximately 11% of the contract's financial value, as prorated for the fifty-two week term of the contract. Plaintiff's former employer, acting on behalf of defendants, wrongly implemented a 28% haircut, or deduction, on the gross amount, which is represented to be $12,500, or $3,583, resulting in net cash proceeds of $6,302.42 [Exhibit #7]

37. the haircut was implemented after plaintiff alerted former employer that the asset, in its "store of value" as a professional services asset 100% owned by plaintiff, as a signatory to the agreement, was not at the time of agreement inception, or at the time of the contract inception, or at any other time thereafter, subject to deductions or haircuts other than those for tax withholding

38. the actions of plaintiff's former employer, on behalf of defendants, have introduced a schism into the relationship of interests with plaintiff, creating a divergence of interests that were - previous to defendants' termination of the contract, and method of implementation of its termination decision - perfectly aligned

39. plaintiff is repulsed by the creation & emergence of a divergence of interests with his former employer, especially in view of plaintiff's responsibilities, parental and otherwise, to promote, defend and advance the financial security and welfare of plaintiff's children

40. plaintiff requires perfect alignment of interests with former employer because former employer is providing cash payments during the term of the agreement to support plaintiff and plaintiff's children [Exhibit #8]; therefore, plaintiff rejected the settlement offer. Plaintiff has not negotiated the check for cash proceeds, evidencing no meeting of the minds on the settlement.

41. plaintiff's invitations to defendants to voluntarily settle the matter have been ignored

42. plaintiff's former employer disavowed any responsibility for resolving their internal payment administrative snafu in plaintiff's favor [Exhibit #6]

43. plaintiff moved to proactively resolve the schism of interests, to cure the defect in a manner that does not enlarge the divergence of interests already introduced, but in a manner that eliminates the divergence, so as not to put at risk the cash payments under the agreement

44. the appropriate and judicious solution to obliterating the newly-introduced schism of interests is to rightly align responsibility with behavior; therefore, first, gen re is to be excused for acting on behalf of defendants [i.e. by way of plaintiff's rejection of the settlement offer], and second, through the filing of this civil motion, plaintiff requests the court to order defendants to account for their behavior and decisions through payment of cash compensation to plaintiff for damages caused personally & professionally, an action it has willfully refused to implement to date, despite repeated requests from plaintiff, and even to the point of hiding their identity behind plaintiff's former employer in the settlement negotiations

45. plaintiff believes the behavior of defendants toward plaintiff has been reckless and negligent, and will continue unabated, placing at risk the interests of future clients; plaintiff believes only a court-imposed solution can effectively modify defendants' behavior. Plaintiff has observed the high degree of effectiveness of punitive damages in similar cases to successfully modify unprofessional behavior, by deterrence and discouragement of such behavior

## RELIEF & REMEDY

**Motion for Summary Judgment in the amount of $105,000 [one hundred five thousand united states dollars] against defendants and in favor of plaintiff**

**Before-tax cash compensation in the amount of $105,000, exclusive of taxes, allocated as follows:**

*Bruce Wilson, individually & for the interests & welfare of Plaintiff's Children*
*$12,500, or true prorated dollar value of unused professional services contract*

*eminent energy promotions, Corporately*
*$12,500, or true prorated dollar value of unused professional services contract*
*$5,000 for lost program & business opportunities ($1,000 net profit per weekly promotional concert tours]*

*Punitive damages in the amount of $75,000*

**No action to be taken against General Reinsurance Corporation**

*plaintiff's interests are to remain cordial and perfectly aligned, for plaintiff's benefit and for the financial security and welfare of plaintiff's children*

**No replacement of professional services contract with another professional services contract or firm, including defendants' firm**

Plaintiff #1

Signature [signature]

Bruce Wilson
351 Pleasant Street
Suite B . PMB 352
Hampshire County
Northampton, MA 01060

413.262.8857 mobile
eminentenergy@yahoo.com

Plaintiff #2

Signature [signature]

eminent energy promotions
bruce wilson, president
351 pleasant street
suite b . pmb 352
hampshire county
northampton . ma . 01060

413.262.8857 mobile
eminentenergy@yahoo.com

EXHIBIT #1

AGREEMENT AND GENERAL RELEASE

General Reinsurance Corporation, with offices at 695 East Main Street, Stamford, CT 06901, (referred to throughout this Agreement as the "Company"), and Bruce L. Wilson ("Employee") agree that:

1. Last Day of Employment. Employee's last day of employment with the Company is October 31, 2004 ("Termination Date").

2. Consideration. In consideration for signing this Agreement and General Release and compliance with the promises made herein, the Company agrees as follows:

a. Inactive Status. Employee's last day of active employment is September 8, 2004 ("Last Day in Office"). Employee will be on inactive status for the period beginning on the Last Day in Office and ending on October 31, 2004, the Termination Date. During this period Employee will be on inactive status and will continue on payroll for salary and benefit purposes only. It is understood and agreed that while on inactive status, Employee will not perform and will owe no services to the Company and the Company owes no obligations to Employee other than as set forth in this Agreement.

b. Severance Pay. The Company agrees to pay to Employee severance pay benefits equal to one month of base salary at his/her normal rate of pay for each year of service, provided however, severance pay does not exceed a maximum of twelve (12) months base salary. That is, the Company promises to pay the Employee a total of $179,095.00 in semi-monthly installments for the period from November 1, 2004 through October 31, 2005 (the "Severance Pay Period"). All payments are to be made less appropriate taxes and deductions.

c. Medical and Dental COBRA Coverage. If Employee elects to continue medical and/or dental coverage under the Company's Group Medical and Dental Expense Plan in accordance with the continuation requirements of COBRA, the Company shall pay for a portion of the cost of said coverage beginning on the Termination Date and ending on the earlier of (i) the last day of the Severance Pay Period or (ii) the day Employee commences employment with an employer providing health benefits. The Employee's share of the cost of COBRA coverage during the Severance Pay Period shall be an amount equal to the cost of coverage for an active employee electing the same benefit coverage option(s) elected by Employee. Thereafter, Employee shall be entitled to elect to continue such COBRA coverage for the remainder of the COBRA period, at his/her own expense. Employee shall give the Company written notice of his/her employment with an employer providing health benefits within one (1) week of such employment.

By executing and returning this Agreement, Employee authorizes the Company to deduct the Employee's cost of medical and dental coverage from the severance payments provided pursuant to paragraph "2(b)" above.

d. Life Insurance Coverage. An Employee's Basic Life Insurance coverage will continue in effect during the Severance Pay Period at the coverage level in effect as of the Employee's Termination Date. Life Insurance Severance Benefits coverage will terminate as of the last day of the Employee's Severance Pay Period

e Outplacement Assistance. The Company has engaged the services of Lee Hecht Harrison to provide Employee professional outplacement counseling

3 Non-Solicitation.

a. Employee acknowledges and agrees that notwithstanding anything in this Agreement to the contrary, payment of any Severance Payment and eligibility for Severance Benefits pursuant to paragraph "2" above is expressly contingent upon Employee's compliance with this paragraph "3". Employee agrees that for the duration of the Severance Pay Period, the Employee will not, directly or indirectly induce or attempt to induce, or cause any person or other entity to induce or attempt to induce, any employee of the Company or any of its subsidiaries or affiliates to leave the employ of the Company or any of its subsidiaries or affiliates, or hire, attempt to hire or assist any person or other entity to hire or attempt to hire, any such employee of the Company or any of its subsidiaries or affiliates.

b. In the event that an Employee is in violation of any of the Employee's obligations under the non-solicitation agreement described in this paragraph "3(a)", Employee shall forfeit any and all rights to any Severance Payments and Severance Benefits under this Agreement. If the Company has not yet paid the Employee a Severance Payment or Severance Benefit or any portion of a Severance Payment or Severance Benefit as of the date the Company learns that the Employee violated any of his or her obligations under the non-solicitation agreement, the Company is not required to pay any further Severance Payments or Severance Benefits to the Employee under the Agreement. If the Company paid the Employee a Severance Payment or any portion of a Severance Payment before the date on which the Company learned that the Employee violated any of his or her obligations under the non-solicitation agreement, the Employee shall return to the Company, and the Company shall be entitled to recover, the full amount of that Severance Payment from the Employee.

4. Benefit Plans. In accordance with normal procedures applicable to employees who separate from service, Employee's participation in all Company benefit plans shall terminate as of the Employee's Termination Date, except as provided in paragraph "2" above and except to the extent that any such plan may provide for continuing participation at the Employee's expense

Furthermore all benefits provided to Employee are determined in accordance with the provisions of the applicable plan document. In the event of a conflict, the plan document will govern. General Re Corporation and the Company reserves the right to amend and/or terminate its benefit plans from time to time and at any time at the Company's sole discretion.

5. No Consideration Absent Execution of this Agreement. Employee understands and agrees that he/she would not receive the monies and/or benefits specified in paragraph "2" above, except for his/her execution of this Agreement and General Release and the fulfillment of the promises contained herein.

6. Vacation. Employee will be paid a lump sum payment, less applicable taxes and deductions, for any accrued, but unused 2004 vacation days and for any unused 2003 vacation days carried over to 2004 (up to a maximum of five (5) vacation days) as of the Termination Date.

7 Re-employment of Employee. Employee understands and agrees that in the event of Employee's reemployment by the Company, the Severance Pay and Medical, Dental and/or Life Insurance coverage's provided pursuant to paragraphs "2" above shall cease as of the date of Employee's rehire.

8. Revocation. Employee may revoke this Agreement and General Release for a period of seven (7) days following the day he/she executes this Agreement and General Release. Any revocation within this period must be submitted, in writing, to Zoe Hopkins, Senior Vice President, and state, "I hereby revoke my acceptance of our Agreement and General Release." The revocation must be personally delivered to Zoe Hopkins or her designee, or mailed to Zoe Hopkins, General Reinsurance Corporation, 695 East Main Street, Stamford, CT 06901 and postmarked within seven (7) days of execution of this Agreement and General Release. This Agreement and General Release shall not become effective or enforceable until the revocation period has expired. If the last day of the revocation period is a Saturday, Sunday, or legal holiday, then the revocation period shall not expire until the next following day which is not a Saturday, Sunday, or legal holiday.

9. General Release of Claim. Employee knowingly and voluntarily **releases and forever discharges the Company, its parent corporations, affiliates, subsidiaries, divisions, predecessor organizations, successors and assigns, and the current and former employees, officers, directors, attorneys and agents thereof (referred to collectively throughout this Agreement as the "Released Entities"), in their official and individual capacities of and from any and all claims, known and unknown,** against the Company, which Employee, his/her heirs, executors, administrators, successors, and assigns (referred to collectively throughout this Agreement as "Employee") have or may have **as of the date of execution of this Agreement and General Release**, including, but not limited to, any alleged violation of:

- The United States and/or State Constitutions;
- Title VII of the Civil Rights Act of 1964, as amended;
- The Civil Rights Act of 1991;
- Sections 1981 through 1988 of Title 42 of the United States Code, as amended;
- The Employee Retirement Income Security Act of 1974, as amended;
- The Fair Credit Reporting Act;
- The Immigration Reform Control Act, as amended;
- The Americans with Disabilities Act of 1990, as amended;
- The Age Discrimination in Employment Act of 1967, as amended;
- The Occupational Safety and Health Act, as amended;
- The Worker Adjustment and Retraining Notification Act;

- The Equal Pay Act;
- The Consolidated Omnibus Budget Reconciliation Act, as amended;
- The Family and Medical Leave Act of 1993;
- The Uniformed Services Employment and Reemployment Rights Act;
- Employee Polygraph Protection Act;
- The Connecticut Family and Medical Leave Act;
- The Connecticut Human Rights and Opportunities Act;
- The Connecticut Minimum Wage Law, as amended;
- The Connecticut Wage and Hour Laws, as amended;
- Equal Pay Law for Connecticut, as amended;
- Whistleblower Act for Connecticut;
- Connecticut Free Speech Act;
- any other federal, state or local civil or human rights law or any other local, state or federal law, regulation or ordinance;
- any public policy, contract (express, written or implied), tort, or common law;
- any claims for vacation, sick or personal leave pay or payment pursuant to any practice, policy, handbook, or manual of the Company; or
- any allegation for costs, fees, or other expenses including attorneys' fees incurred in these matters.

10. No Claims Exist. Employee confirms that no claim, charge, complaint, or action exists in any forum or form. In the event that any such claim, charge, complaint or action is filed, Employee shall not be entitled to recover any relief or recovery therefrom, including costs and attorney's fees.

11. No Participation in Claims. Employee understands that if this Agreement were not signed, Employee would have the right to voluntarily assist other individuals or entities in bringing claims against the Company. Employee hereby waives that right and he/she will not provide any such assistance other than assistance in an investigation or proceeding conducted by an agency of the United States government.

12. Applicable Data. Attached as Exhibit "A" is a list of the job titles and ages of all individuals eligible for severance benefits offered by the Company. Attached, as Exhibit "B" is a list of the ages of all individuals in Employee's job classification or organizational unit who are ineligible for severance benefits.

13. Confidentiality

a. Employee agrees not to divulge at any time any information of a confidential or sensitive nature with which Employee has been entrusted or which has come into Employee's possession while an employee of the Company or any Released Entities, nor will Employee disparage the Company or any Released Entities, their employees, directors, or officers, or their business or reputation.

b. Unless required by valid subpoena or other legal process, Employee agrees not to disclose any information regarding the existence or substance of this Agreement and General Release, except to an attorney and/or accountant with whom Employee chooses to consult regarding his/her consideration of this Agreement and General Release, except to an immediate family member, or except to obtain compliance with the Agreement.

14. Employee's Cooperation. Employee agrees to cooperate with the Company in any litigation or arbitration involving matters in which Employee participated during his/her employment or about which Employee has acquired knowledge during his/her employment by the Company. The Company shall pay any expenses incurred by Employee at its request to such litigation or arbitration.

15. Repayment of Debt to Company. Employee agrees either to pay in full or to make arrangements with the Company for full payment within a reasonable time of any indebtedness of the Company incurred in connection with his/her employment, including any financial obligations incurred on Company credit cards, or otherwise paid for Employee on his/her behalf by the Company. If full payment of all such indebtedness is not received by the Employee's Termination Date, the Company will reduce the amount of benefits paid hereunder by an amount equal to the outstanding indebtedness.

16. No Future Application for Employment. Employee shall not apply for employment with General Re Corporation and/or its subsidiary corporations on or after the Termination Date.

17. Governing Law and Interpretation. This Agreement and General Release should be governed and conformed in accordance with the laws of the State of Connecticut without regard to its conflict of laws provision. Should any provision of this Agreement and General Release be declared illegal or unenforceable by any court of competent jurisdiction and cannot be modified to be enforceable, excluding the general release language, such provision shall immediately become null and void, leaving the remainder of this Agreement and General Release in full force and effect. However, if any portion of the general release language were ruled to be unenforceable for any reason, Employee shall return the consideration paid hereunder to the Company.

18. Nonadmission of Wrongdoing. Employee agrees that neither this Agreement and General Release nor the furnishing of the consideration for this Release shall be deemed or construed at anytime for any purpose as an admission by the Company of any liability or unlawful conduct of any kind.

19. Amendment. This Agreement and General Release may not be modified, altered or changed except upon express written consent of both Parties wherein specific reference is made to this Agreement and General Release.

20. Entire Agreement. This Agreement and General Release sets forth the entire agreement between the Employee and the Released Entities hereto, and fully supersedes any prior agreements or understandings between the parties. Employee acknowledges that he/she has not relied on any representations, promises, or agreements of any kind made to him/her in connection with his/her decision to accept this Agreement and General Release, except for those set forth in this Agreement and General Release.

**EMPLOYEE HAS BEEN ADVISED IN WRITING THAT HE/SHE HAS UP TO FORTY-FIVE (45) DAYS TO CONSIDER THIS AGREEMENT AND GENERAL RELEASE AND TO CONSULT WITH AN ATTORNEY PRIOR TO EXECUTION OF THIS AGREEMENT AND GENERAL RELEASE.**

**EMPLOYEE AGREES THAT ANY MODIFICATIONS, MATERIAL OR OTHERWISE, MADE TO THIS AGREEMENT AND GENERAL RELEASE DO NOT RESTART OR AFFECT IN ANY MANNER THE ORIGINAL FORTY-FIVE DAY CONSIDERATION PERIOD.**

**HAVING ELECTED TO EXECUTE THIS AGREEMENT AND GENERAL RELEASE, TO FULFILL THE PROMISES SET FORTH HEREIN, AND TO RECEIVE THEREBY THE SUMS AND BENEFITS SET FORTH IN PARAGRAPH "2" ABOVE, EMPLOYEE FREELY AND KNOWINGLY, AND AFTER DUE CONSIDERATION, ENTERS INTO THIS AGREEMENT AND GENERAL RELEASE INTENDING TO WAIVE, SETTLE AND RELEASE ALL CLAIMS HE/SHE HAS OR MIGHT HAVE AGAINST THE COMPANY, ITS PARENT CORPORATIONS, AFFILIATES, SUBSIDIARIES, DIVISIONS, PREDECESSOR ORGANIZATIONS, SUCCESSORS AND ASSIGNS, AND THE CURRENT AND FORMER EMPLOYEES, OFFICERS, DIRECTORS AND AGENTS THEREOF, IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES.**

IN WITNESS WHEREOF, the parties hereto knowingly and voluntarily executed this Agreement and General Release as of the date set forth below:

General Reinsurance Corporation

By: Zoe P. Hopkins
Zoe P. Hopkins
Senior Vice President - GRC

Bruce L. Wilson
Employee

Dated: September 8, 2004

Dated: 9-10-04

EXHIBIT #2

# LEE HECHT HARRISON

**One Landmark Square, 15th Floor, Stamford, CT 06901**

Ms. Zoe Hopkins
Vice President
General Reinsurance Corp.
695 East Main Street
Stamford, CT 06904

| | |
|---|---|
| Invoice | 195663 |
| Invoice Date | November 17, 2004 |
| Page | 1 of 1 |

For Professional Services

---

| | | |
|---|---|---|
| Client Name: | Wilson, Bruce | $ 12,500.00 |
| Type of Service: | Executive Service | |
| Duration: | 12 Months | |
| Service Location: | Hartford, CT | |
| Start Date: | 11/15/04 | |

**TOTAL AMOUNT DUE: $ 12,500.00**

**INVOICE DUE DATE: 11/27/04**

**Please MAIL your payment to:**
Lee Hecht Harrison LLC
Dept CH #10544
Palatine, IL 60055-0544

**or WIRE TRANSFER your payment to:**
Bank: Mellon Bank
3 Mellon Center
Pittsburgh, PA 15259
ABA #: 043000261
Acct: Lee Hecht Harrison LLC
Acct #: 079-2503

Lee Hecht Harrison LLC Federal Taxpayer ID #: 11-3575564

For billing inquiries, call 203-964-9600

PFO 3100HOS

EXHIBIT #3

Gen Re.

Zoe P. Hopkins
Senior Vice President and Assistant General Counsel

February 24, 2005

2.28.05

Bruce Wilson
Eminent Energy Promotions
351 Pleasant Street
Suite B PMB 352
Northhampton, MA 01060

hi zoe,
signed amendment enclosed. pls let me know if there are any other issues - thx
Bruce

Re: Outplacement

Dear Bruce:

This will confirm our telephone conversation earlier this week regarding your dissatisfaction with the outplacement services offered to you by Lee Hecht Harrison.

The Company has offered to pay you a lump sum payment of $12,500.00, less taxes and deductions, in return for a release of all claims relating to outplacement services.

The amount of $12,500.00 represents the value of the Lee Hecht Services, as confirmed by their invoice dated November 17, 2004, a copy of which is enclosed.

Enclosed are duplicate originals of a Release Agreement. Please sign and return one original in the enclosed return envelope. The second copy is for your files.

Please let me know if you have any questions

Regards,

Zoe

Zoe P. Hopkins

Enclosure

General Reinsurance Corporation
Financial Centre, 695 East Main Street, Stamford, CT 06901
Tel. 203 328 5509, Fax 203 328 6071
zhopkins@genre.com, www.genre.com

A Berkshire Hathaway Company

**EXHIBIT #3**

AMENDMENT TO AGREEMENT AND GENERAL RELEASE

General Reinsurance Corporation, with offices at 695 East Main Street, Stamford, CT 06901, (referred to throughout this Amendment as the "Company"), and Bruce L. Wilson ("Employee") agree to amend the Agreement and General Release dated September 9, 2004 (the "Agreement") as follows:

1. Consideration. In consideration for signing this Amendment to Agreement and General Release (the "Amendment") and in lieu of the Outplacement Assistance provided to Employee under Paragraph 2e of the Agreement, the Company agrees to pay Employee a total of $12,500.00 representing the full value of such Outplacement Assistance to Employee. A copy of the Outplacement Assistance agreement with Lee Hecht Harrison is attached hereto. The payment is to be made less appropriate taxes* and deductions. [Note #1]

2. No Consideration Absent Execution of this Amendment. Employee understands and agrees that he would not receive* the monies specified in Paragraph "1" above, except for his execution of this Amendment and the fulfillment of the promises contained herein. [Note #2]

3. General Release of Claim. Employee knowingly and voluntarily **releases and forever discharges the Company and Lee Hecht Harrison ("Lee Hecht"), their parent corporations, affiliates, subsidiaries, divisions, predecessor organization, successors and assigns, and their current and former employees, officers, directors, attorneys and agents thereof (referred to collectively throughout this Amendment as the "Released Entities"), in their official and individual capacities of and from any and all claims, known and unknown,** against the Company and Lee Hecht, which Employee, his heirs, executors, administrators, successors, and assigns (referred to collectively throughout this Amendment as "Employee") have or may have **as of the date of execution of this Amendment**, including, but not limited to any and all claims relating to Outplacement Assistance provided to Employee from September 9, 2004 up to the date of execution of this Amendment, any public policy, contract (express, written or implied), tort or common law, any allegation for costs, fees, or other expenses including attorneys' fees incurred in these matters.

4. Entire Agreement. Except as provided in this Amendment, the Agreement sets forth the entire agreement between the Employee and the Released Entities hereto, and fully supersedes any prior agreements or understandings between the parties. Employee acknowledges that he has not relied upon any representations, promises, or agreements of any kind made to him in connection with his decision to accept this Amendment, except for those set forth in this Amendment.

**EMPLOYEE UNDERSTANDS AND AGREES THAT ANY MODIFICATIONS, MATERIAL OR OTHERWISE MADE TO THE AGREEMENT AND GENERAL RELEASE DO NOT AFFECT IN ANY MANNER THE PARTIES OBLIGATIONS UNDER ORIGINAL AGREEMENT AND GENERAL RELEASE, EXCEPT AS EXPRESSLY PROVIDED INTHIS AMENDMENT.**

**EXHIBIT #3**

HAVING ELECTED TO EXECUTE THIS AMENDMENT TO AGREEMENT AND GENERAL RELEASE, TO FULFILL THE PROMISES SET FORTH HEREIN, AND TO RECEIVE THEREBY THE SUM SET FORTH IN PARAGRAPH "1" ABOVE, EMPLOYEE FREELY KNOWINGLY, AND AFTER DUE CONSIDERATION, ENTERS INTO THIS AMENDMENT TO AGREEMENT AND GENERAL RELEASE INTENDING TO WAIVE, SETTLE AND RELEASE ALL CLAIMS HE HAS OR MIGHT HAVE AGAINST THE COMPANY AND LEE HECHT, THEIR PARENT CORPORATIONS, AFFILIATES, SUBSIDIARIES, DIVISONS, PREDECESSOR ORGANIZATIONS, SUCCESSORS AND ASSIGNS, AND THEIR CURRENT AND FORMER EMPLOYEES, OFFICERS, DIRECTORS AND AGENTS THEREOF, IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES RELATING TO OUTPLACEMENT ASSISTANCE PROVIDED TO EMPLOYEE.

IN WITNESS WHEREOF, the parties hereto knowingly and voluntarily executed this Amendment to Agreement and General Release as of the date set forth below:

General Reinsurance Corporation

By: *Zoe P. Hopkins*
Zoe Hopkins
Senior Vice President - GRC

Dated: February 24, 2005

Bruce Wilson * [note #3]

*Bruce Wilson*
Bruce Wilson

Dated: 2.28.05

- Note #1: pls leave me as much discretion as legally possible to manage my taxes, i.e. pls withold as low a % as possible for the fewest # of agencies as possible.

The value of the outplacement contract was not subject to any court orders applying to, or involving, genre at its inception, or at any time thereafter, and should not, therefore, be subject to any such orders now

- Note #2: pls issue paper check, overnight to current address you have on file. I will be happy to pay for the costs of mailing.
- Note #3: thank you, Zoe.

EXHIBIT #4

site index | contact us

RRISON | *Global Career Management Services*

search

About LHH | Solutions & Services | News | Events | Knowledge Center

January 28, 2005

## Executive Team

**LHH Office Locator**

Select a Country

Are
reer
ion
s (AIM)
ship
ting
lology
ty
inity
Serve
c
; &
s
nent at
s
s

Our executive team are leaders and visionaries who are all well respected experts in career management. Read more about their experience.

| | |
|---|---|
| **Paul R. O'Donnell** | President and Chief Operating Officer |
| **Peter Alcide** | Executive Vice President, Chief Financial and Corporate Development Officer |
| **Barbara T. Barra** | Executive Vice President, Northeast Region |
| **Julie Beck** | Executive Vice President, Central Region |
| **Edouard Comment** | Executive Vice President, European Operations |
| **Robert J. Freiburger** | Executive Vice President, Southern Region |
| **Andrea Huff** | Executive Vice President, Leadership Consulting |
| **Rick Junius** | Executive Vice President, Western Region |
| **Bernadette Kenny** | Executive Vice President, Chief Global Sales and Marketing Officer |
| **John M. Mears** | Executive Vice President, Field Support Services |

**Related Links**
- LHH News
- Who We Serve
- Our Career Transition Process (AIM)
- Our Leadership Consulting Methodology

**Contact Us**
- Get more information about LHH services
- Find your local LHH office

arbara T. Barra | Executive Team Bio | Global Career Services | Lee Hecht Harrison

Page 1 of 2

site index | contact us

.EE HECHT HARRISON | Global Career Management Services

search

Iome | About LHH | Solutions & Services | News | Events | Knowledge Center

January 28, 2005

Executive Team

LHH Office Locator

Select a Country

About LHH

Who We Are

- Our Career Transition Process (AIM) ®
- Our Leadership Consulting Methodology
- Quality
- Diversity
- Community Service

Who We Serve

Strategic Partners & Alliances

Employment at LHH

Related Business Divisions

# Barbara T. Barra

## Executive Vice President, Northeast Region

***"We must routinely assess and improve our services in light of emerging marketplace trends and the changing needs and expectations of the clients we serve."***

As Executive Vice President for Lee Hecht Harrison's Northeast Region, Barbara oversees the P&L performance and service delivery of 20 offices in the practice areas of Career Transition, Career Development, and Leadership Consulting.

Barbara brings to this role a wealth of personal experience consulting with client companies on a wide range of strategic organizational initiatives including restructuring, mergers/acquisitions/divestitures, reengineering and culture change. Her background also includes working with individual clients as an executive coach, leadership team facilitator and career transition consultant.

After joining Lee Hecht Harrison in 1987 as a Senior Career Consultant in New York , Barbara was appointed General Manager of one of the firm's New Jersey offices, followed by Managing Director of the company's flagship New York City office. Her earlier career encompassed over 15 years in the pharmaceutical, chemical and retail industries in senior human resources roles.

Barbara has extensive public speaking experience and has been interviewed for print, television and radio regarding issues related to career management. She holds a Master's degree in Human Resources from Cornell University. In addition, she is a

Contact Us

- Get more information about LHH services
- Find your local LHH office

tp://www.lhh.com/about/who/bios/barra.cfm 1/28/2005

**EXHIBIT #5**

--- Barbara Barra <barbara_barra@lhh.com> wrote:

> Hello, Bruce.
>
> Your January 28th email correspondence to
Info@LHH.com which
> you submitted in response to my voice mail messages
has been forwarded to
> me. Actually, I would have preferred to speak to
you directly,
> but in the interest of resolving this issue
quickly, I am writing to you.
>
> Based upon your dissatisfaction with LHH's
services, your
> stated needs and expectations, and a complete
review of the file maintained by
> LHH documenting the services provided to you, we
have determined
> that your service at LHH should be discontinued and
that the unused
> portion of the fee will be credited to your former
employer, General
> Reinsurance.

EXHIBIT #5

This is the case despite our best efforts to provide
you with
> professional career transition services. This
decision has already been
> communicated to General Reinsurace, so you should
contact them directly
> regarding whether they will provide you with
services through another
> vendor. Rest assured that we did not provide any
details regarding the
> services LHH provided for you but merely advised
them of your
> dissatisfaction and our belief that continuation of
services would not be productive
> for you or LHH.

> Finally, I note that in your correspondence earlier
today, you
> questioned whether I or LHH had recorded telephone
conversations with
> you. This did not occur. It is not LHH's
policy or practice to record
> telephone conversations.
>
> Our very best wishes for success with your
entrepreneurial
> venture.
>
> Barbara
>
>
>
> -----------------------
> Barbara Barra
> Executive Vice President - Northeast Region
> Lee Hecht Harrison
> 50 Tice Boulevard
> Woodcliff Lake, NJ 07677
> Direct dial:(908) 766-0150
> Fax: 973-755-9178
> e-mail: Barbara_Barra@lhh.com

Yahoo! Mail - eminentenergy@yahoo.com [illegible]

YAHOO! MAIL

Print - Close Window

| | |
|---|---|
| Date: | Sat, 5 Mar 2005 09:47:23 -0800 (PST) |
| From: | "bruce wilson" <eminentenergy@yahoo.com> |
| Subject: | Re: lee hecht payment deductions |
| To: | zhopkins@genre.com |
| CC: | "joe brandon" <jbrandon@genre.com> |

[illegible]

i have [illegible] the check yet, and that [illegible] agreement [illegible]

the value of the lhh services were mine [illegible] prior to the cancellation and not subject to garnishment of any kind

in the conversion process, from lhh to gen re to me, gen re has compromised my [illegible] ownership rights in this asset [illegible] the amount of the [illegible] garnishment

[illegible] needs to be undone, [illegible], and the full value of the lhh services paid to me

gen re [illegible] the value to me as something else, it is not cash compensation - that is [illegible] gen re - [illegible] that is [illegible] as it was previously as if the services were not deemed cash compensation

gen re [illegible] the other [illegible] deposit on the garnishment and if need be, [illegible] the [illegible] for the [illegible]

pls [illegible] this [illegible]

[illegible] tell me [illegible] my contractual right was not damaged by gen re, and thereby the interests and welfare of my children

bruce

--- zhopkins@genre.com wrote:

Hi Bruce -

Payroll has provided the following information:

```
$11,[illegible]     Gross
    [illegible]     Federal Withholding
    [illegible]     Social Security
    [illegible]     Medicare
    [illegible]     State
    [illegible]     Garnishment
$ [illegible]       Net
```

Unfortunately, any cash payment is considered as compensation for purposes of a court support order or wage garnishment. We have no flexibility and are required to comply.

I hope this answers your question.

Regards,
[illegible]

EXHIBIT #6

bruce wilson

http://us.f300.mail.yahoo.com/ym/ShowLetter?box=lee%20hecht%20harriso... 3/5/2005

zhopkins@genre.com

jbrandon@genre.com

Subject: lee hecht [illegible]

Hi [illegible],

[illegible] the [illegible] seems heavy, [illegible]

What are the other deductions?

did payroll inadvertently deem this "cash compensation" as subject to [illegible] [illegible], when it is not and had not been prior thereto? [illegible] documentation - which i [illegible] my personal and [illegible]

prior to the conversion, i believe i [illegible] 10% of the proceeds, or not?

[illegible]

[illegible]

bruce [illegible] president
eminent energy promotions
[illegible] pleasant street
suite [illegible] pmb [illegible]52
northampton . ma . 01060
[illegible] [illegible] [illegible]97 mobile
eminentenergy@yahoo.com

Celebrate Yahoo!'s 10th Birthday!
Yahoo! Netrospective: 100 Moments of the Web
http://birthday.yahoo.com/netrospective/

This e-mail, including attachments, is intended for the person or company named and may contain confidential and/or legally privileged information. Unauthorized disclosure, copying or use of this information may be unlawful and is prohibited. If you are not the intended recipient, please delete this message and notify the sender.

**EXHIBIT #7**

Rec. Thurs 3.3.05

- s/w Jill Duke - need accompanying deduction worksheet
  - for my taxes
  - to confirm payroll ded not subject to court support orders
- v mail Zoe Hopkins - same

GENERAL REINSURANCE CORPORATION

PERIOD ENDING 2/25/05

NAME Bruce C. Wilson

| | | | |
|---|---|---|---|
| TOTAL EARNINGS | | 1,350 | 00 |
| F.I.C.A. | | | |
| WITHHOLDING U.S. INCOME TAX | | | |
| STATE INCOME TAX | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| TOTAL DEDUCTIONS | | | |
| NET PAY | | 1,350 | 42 |

EMPLOYEE'S STATEMENT OF EARNINGS

GENERAL REINSURANCE CORPORATION

PERIOD ENDING 2/25/05

NAME Bruce C. Wilson

| | | | |
|---|---|---|---|
| TOTAL EARNINGS | | 1,350 | 00 |
| F.I.C.A. | | | |
| WITHHOLDING U.S. INCOME TAX | | | |
| STATE INCOME TAX | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| TOTAL DEDUCTIONS | | | |
| NET PAY | | 1,350 | 42 |

EMPLOYEE'S STATEMENT OF EARNINGS

WILSON 3/2/04

**GENERAL REINSURANCE CORPORATION**
FINANCIAL CENTRE
P.O. BOX 10350
STAMFORD, CT 06904-2350

3598

$\frac{1-2}{210}$300

DATE MAR 02 2005

PAY TO THE ORDER OF BRUCE WILSON $ ****6302.42

GENERAL RE GROUP FINANCIAL CENTER DOLLARS

JPMorgan
JPMorgan Chase Bank
270 Park Avenue
New York, NY 10017

FOR

⑈003598⑈ ⑆021000021⑆6100929951⑈

YAHOO! MAIL

Print - Close Window

**Date:** Sat, 5 Mar 2005 09:47:23 -0800 (PST)

**From:** "bruce wilson" <eminentenergy@yahoo.com>

**Subject:** Re: lee hecht payment deductions

**To:** zhopkins@genre com

**CC:** "joe brandon" <jbrandon@genre.com>

**EXHIBIT #8**

[illegible]

[illegible]

the value of the lhh services [illegible] the [illegible] and not subject to garnishment [illegible]

In the conversion process, from lhh to genre to me, genre has compromised my private contractual [illegible] rights in this asset by the amount of the garnishment

[illegible] the full value of the lhh services paid to me

genre has to [illegible] the value to me as something else, it is not cash compensation [illegible] as if the services were not deemed cash compensation

[illegible] deposit in the garnishment and [illegible]

[illegible]

[illegible] was not damaged [illegible], and thereby the interests and welfare of my children

Bruce

--- zhopkins@genre.com wrote:

> Hi Bruce -
>
> Payroll has provided the following information:
>
> $10,7[illegible] Gross
> [illegible] Federal Withholding
> [illegible] Social Security
> (183.28) Medicare
> (298.23) State
> (563.0[illegible]) Garnishment
> $ [illegible],330.41 Net
>
> Unfortunately, any cash payment is considered as compensation for purposes of a court support order or wage garnishment. We have no flexibility and are required to comply.
>
> I hope this answers your question.
>
> Regards,
> [illegible]

Bruce Wilson

**EXHIBIT #8**

YAHOO! MAIL

Print - Close Window

| | |
|---|---|
| **Date:** | Sat, 5 Mar 2005 11:03:50 -0800 (PST) |
| **From:** | "bruce wilson" <eminentenergy@yahoo.com> |
| **Subject:** | Re: lee hecht payment deductions |
| **To:** | zhopkins@genre com |
| **CC:** | "joe brandon" <jbrandon@genre.com>, rmanz@genre.com, ncanelos@genre.com |

another thought to you, zoe, if i may, as i have to, because i am becoming quite concerned that gen re's handling of this matter the more it resonates with me...

and i don't want to be at odds with gen re, i have done what i can to remain aligned with gen re - i have communicated this in writing and verbally a dozen times to you and other former colleagues

however, gen re unilaterally subjected my 100 contractual property value of the lee hecht services contract to a 28 "garnishment" in the internal administrative process of converting this to a paper check

had lee hecht not cancelled this contract, this would not have occurred

or for that matter, why did gen re not take the 28 haircut of the lee hecht contract at the time the severance agreement was executed? why now?

zoe, this is a new term for me, not one gen re has used previously - what is the basis of the "garnishment"; i know of no "garnishment" orders in effect

is there a "garnishment" order in effect? was this an error?

gen re will need to disclose and identify to me the nature of the "garnishment" sooner or later

there are support orders applying to gen re of which i am aware, but no garnishment orders - were these terms confused by gen re? is there a new garnishment order that came into effect after the execution of the severance agreement and in effect at the time lee hecht terminated their services contract?

[btw - zoe, we need to talk about the behavior of my attorneys, esp. during the summer and fall of 2004, at some point - i have reason to believe they initiated secret conversations with gen re prior to the severance period, without my knowledge or approval - i do not know with whom, but they let this slip at one point in january 2005. ...i have been intending to follow up on it with hard evidence, because it is a nettlesome issue, which i would obtain with court-ordered land line and mobile telecommunications carriers for all parties to match call times and dates]

in any event, gen re's misclassification error of the lhh asset, as "cash compensation" left me with less than 100 before the process started, or ??

that puts my interests at odds with the interests of gen re, at least until someone educates me as to why the seeming arbitrary 28 haircut does not injure my contractual property rights

so what do i do?

first, i re-read the severance agreement. i find no clause granting gen re unilateral freedom to reclassify various assets covered by it for my benefit, or that i contractually own

i find no language granting gen re the freedom to unilaterally compromise my contractual property rights to any of these assets

on the contrary, i believed gen re would take no action that would damage my

contractual property rights, and take [illegible] to protect and safeguard those interes[illegible]

second, i search to determine that i have been in compliance with the terms of the agreement. i believe i have. if my understanding is not correct, you must advise me

third, i reaffirm my intentions to shred any part [illegible] behaving in a manner adverse to my interests, and their aligned, the interests of my children

fourth, does the matter at hand have characteristics resembling those of the portfolio referenced in the previous step

fifth, i communicate freely with those i consider allies, and i enlarge the circle of communication, inviting a larger body of allied knowledge to consider the matter, with hopeful acceptance by way of suggestions and immediate action to resolve, or facilitate the resolution of, the matter

sixth, get a higher education on the matter. asking "why" repeatedly usually accomplishes much

seventh, propose alternative solutions....this i did in my earlier email, on the specific matter of the lee hecht contract: reverse what was done and make it right

and again here: zoe, why don't we handle all the remaining assets in the agreement as gen re did the lee hecht contract, terminate it immediately, take the haircut, carve out the lump sums, split it all up, and save gen re the administrative costs and future persnickety emails from me

from what i read in the wsj, gen re has higher valued matters with which it must now deploy resources

my phone is always on

bruce

--- zhopkins@genre.com wrote:
>
> Hi Bruce -
>
> Payroll has provided the following information:
>
> $12,500.00 Gross
> (700.00) Federal Withholding
> (775.00) Social Security
> (181.25) Medicare
> (959.33) State
> (3583.00) Garnishment
> $ 6,302.42 Net
>
> Unfortunately, any cash payment is considered as compensation for purposes
> of a court support order or wage garnishment. We have no flexibility and
> are required to comply
>
> I hope this answers your question.
>
> Regards,
> Zoe
>
>
>
>
>
> bruce wilson
>
> [illegible]minenrenergy@ya To: zoe hopkins
> <zhopkins@genre.com>

**EXHIBIT #9**

AMENDMENT TO AGREEMENT AND GENERAL RELEASE

General Reinsurance Corporation, with offices at 695 East Main Street, Stamford, CT 06901, (referred to throughout this Amendment as the "Company"), and Bruce L. Wilson ("Employee") agree to amend the Agreement and General Release dated September 9, 2004 (the "Agreement") as follows:

1. Consideration. In consideration for signing this Amendment to Agreement and General Release (the "Amendment") and in lieu of the Outplacement Assistance provided to Employee under Paragraph 2e of the Agreement, the Company agrees to pay Employee a total of $12,500.00 representing the full value of such Outplacement Assistance to Employee. A copy of the Outplacement Assistance agreement with Lee Hecht Harrison is attached hereto. The payment is to be made less appropriate taxes and deductions.

2. No Consideration Absent Execution of this Amendment. Employee understands and agrees that he would not receive the monies specified in Paragraph "1" above, except for his execution of this Amendment and the fulfillment of the promises contained herein.

3. General Release of Claim. Employee knowingly and voluntarily **releases and forever discharges the Company and Lee Hecht Harrison ("Lee Hecht"), their parent corporations, affiliates, subsidiaries, divisions, predecessor organization, successors and assigns, and their current and former employees, officers, directors, attorneys and agents thereof (referred to collectively throughout this Amendment as the "Released Entities"), in their official and individual capacities of and from any and all claims, known and unknown**, against the Company and Lee Hecht, which Employee, his heirs, executors, administrators, successors, and assigns (referred to collectively throughout this Amendment as "Employee") have or may have **as of the date of execution of this Amendment**, including, but not limited to any and all claims relating to Outplacement Assistance provided to Employee from September 9, 2004 up to the date of execution of this Amendment, any public policy, contract (express, written or implied), tort or common law, any allegation for costs, fees, or other expenses including attorneys' fees incurred in these matters.

4. Entire Agreement. Except as provided in this Amendment, the Agreement sets forth the entire agreement between the Employee and the Released Entities hereto, and fully supersedes any prior agreements or understandings between the parties. Employee acknowledges that he has not relied upon any representations, promises, or agreements of any kind made to him in connection with his decision to accept this Amendment, except for those set forth in this Amendment.

**EMPLOYEE UNDERSTANDS AND AGREES THAT ANY MODIFICATIONS, MATERIAL OR OTHERWISE MADE TO THE AGREEMENT AND GENERAL RELEASE DO NOT AFFECT IN ANY MANNER THE PARTIES OBLIGATIONS UNDER ORIGINAL AGREEMENT AND GENERAL RELEASE, EXCEPT AS EXPRESSLY PROVIDED INTHIS AMENDMENT.**

**HAVING ELECTED TO EXECUTE THIS AMENDMENT TO AGREEMENT AND GENERAL RELEASE, TO FULFILL THE PROMISES SET FORTH HEREIN, AND TO RECEIVE THEREBY THE SUM SET FORTH IN PARAGRAPH "1" ABOVE, EMPLOYEE FREELY KNOWINGLY, AND AFTER DUE CONSIDERATION, ENTERS INTO THIS AMENDMENT TO AGREEMENT AND GENERAL RELEASE INTENDING TO WAIVE, SETTLE AND RELEASE ALL CLAIMS HE HAS OR MIGHT HAVE AGAINST THE COMPANY AND LEE HECHT, THEIR PARENT CORPORATIONS, AFFILIATES, SUBSIDIARIES, DIVISONS, PREDECESSOR ORGANIZATIONS, SUCCESSORS AND ASSIGNS, AND THEIR CURRENT AND FORMER EMPLOYEES, OFFICERS, DIRECTORS AND AGENTS THEREOF, IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES RELATING TO OUTPLACEMENT ASSISTANCE PROVIDED TO EMPLOYEE.**

IN WITNESS WHEREOF, the parties hereto knowingly and voluntarily executed this Amendment to Agreement and General Release as of the date set forth below:

General Reinsurance Corporation

By: Zoe P. Hopkins
Zoe Hopkins
Senior Vice President - GRC

Dated: February 24, 2005

Bruce Wilson

______________________
Bruce Wilson

Dated: ________________